**Karen L. MANK as plan administrator for the Hannaford Health Plan, Plaintiff**

**v.**

**Ellen GREEN, Lloyd Green, Jack Simmons, and Berman & Simmons, P.A., Defendants**

**No. CIV.03–42–P–C.**

United States District Court, D. Maine.

March 29, 2005.

Seth W. Brewster, Gregg H Ginn, Verrill & Dana, Portland, ME, for Karen L Mank, Plaintiff.

Julian L. Sweet, Berman & Simmons, P.A., Lewiston, ME, Peter J. Rubin, Daniel J. Mitchell, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Ellen Green,

Jack H Simmons, Berman & Simmons, PA, Lloyd Green, Defendants.

**MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNT III**

GENE CARTER, Senior District Judge.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Counts I, II, III), federal common law (Counts IV, V, VI, VII), and state common law (Counts VIII, IX, X, XI) against Defendants Ellen Green, Lloyd Green, and their attorneys, Jack H. Simmons and the law firm of Berman & Simmons, P.A. seeking to recover $141,335.75 that was paid by the Hannaford Health Plan for Mrs. Green's accident-related medical expenses. *See* Amended Complaint and Request for Injunctive Relief ("Amended Complaint") (Docket Item No. 64). The Court has already granted summary judgment or dismissed all claims except Count III (Docket Item Nos. 127 and 153). On the claims against the Greens, which the Court has already adjudicated, the Plan has recovered $83,941.21 in identifiable proceeds. *See* Docket Item No. 177. In Count III, Plaintiff does not allege that Defendants are in violation of any substantive provisions of ERISA; rather she contends that they have violated the terms of the Plan. The Plan now seeks through Count III to recover the remaining $57,394.54 from the attorneys'

fee paid to Attorney Simmons and Berman & Simmons.

## I. FACTS

Plaintiff Karen Mank is the Plan Administrator for the Hannaford Health Plan ("the Plan" or "the Health Plan"), which is a self-funded "employee welfare benefit plan" within the meaning of ERISA. Hannaford Bros. Co. and its subsidiaries are involved in the distribution and retail sale of food, prescription drugs and related products through supermarkets and other retail locations in New England as well as other regions of the United States. Among the benefits that it offers its employees, Hannaford provides health benefits that are designed to assist its employees (and their eligible dependents and domestic partners) in obtaining appropriate health care for a wide variety of conditions. Ellen Green is an employee of Hannaford, and is a participant in, and beneficiary of, the Plan.[1]

On June 18, 2001, Mrs. Green was seriously injured when, as a pedestrian, she was struck by a motor vehicle. Mrs. Green incurred significant medical expenses arising from her injuries suffered in the accident.[2] The Plan paid $141,335.75 in medical benefits on behalf of Mrs. Green arising from her injuries suffered in the accident. Second Mank Aff. at ¶ 6. At the time of the accident, the Plan's right of recovery provisions read as follows:

If the amount of benefit payments made by the Plan is more than should have been paid under the Plan, or if payments are made by a third party with respect

---

1. The Hannaford Bros. Co. Tax Exempt Employee Benefits Trust funds the Health Plan. Both Hannaford and its employees contribute to the Trust Fund. Second Affidavit of Karen Mank (Docket Item No. 96) ¶ 3. Under the terms of the Health Plan, Green is a "Covered Person." *Id.* ¶ 5.

2. Mrs. Green incurred these medical expenses during the period of June 18, 2001 through October 2001.

to a Covered Person, the Plan shall have the right to recover the excess from the persons it has paid or for whom it has paid or from any other group health plan to which the Plan was secondary under the provisions of Article VI.

A Covered Person who recovers payment from a third party shall reimburse the Plan for the amount of benefit payments made, in full and without reduction for attorneys' fees or costs, from the proceeds received from the third party, whether the proceeds are paid by way of settlement, judgment, or otherwise, and the Plan shall have an equitable interest in the amount recovered, or to be recovered, for the amount of benefit payments made.

The Plan shall have the right to withhold future benefit payments to which a claimant or a Covered Person through whom the claimant derives his or her claim may be entitled until the obligation to the Plan under the foregoing provisions of this Section, plus interest, has been satisfied. This right to offset shall not limit the right of the Plan to recover an erroneous or excess payment in any other manner, and the Plan shall equally have the right to institute legal action against a Covered Person for failure to reimburse the Plan or to honor its equitable interest in the amount recovered from a third party, and the Covered Person shall be liable in such event for all costs of collection, including reasonable attorneys' fees.

For purposes of this Section, the "amount of benefit payments made" shall include in appropriate cases the reasonable cash value of any benefits provided in the form of services.

Second Mank Aff. Ex. 1.

The Greens retained Attorney Jack H. Simmons and the law firm of Berman & Simmons, P.A. to represent them in a legal claim against the third-party who caused her injuries.[3] On June 20, 2001, two days after the accident, Lloyd Green, Ellen Green's husband, met with Attorney Simmons. Fourth Affidavit of Seth Brewster (Docket Item No. 164) Ex. 2, at BS 266. In that meeting, Mr. Green described the accident and informed Attorney Simmons that Mrs. Green received her health benefits through her employer Hannaford. *Id.* at BS 269. On July 2, 2002, Attorney Simmons met with Ellen Green to discuss the accident and the accident investigation. *Id.* at BS 270–273. At that time, Ellen Green executed a Contingent Fee Agreement with Berman & Simmons.[4] *Id.* Ex. 3.

Sometime in July 2001, the Plan sent Mrs. Green a form to complete relating to her accident. On July 31, 2001, Mrs. Green completed the form that provided the requested information to the Plan, including the name and address of her attorney, as well as the name and address of the insurance company for the owner of the vehicle that hit her. Affidavit of Ellen Green (Docket Item No. 53), at ¶¶ 3–4. Specifically, Mrs. Green signed the document acknowledging as follows:

3. Attorney Simmons is a shareholder, officer, director and registered agent of Berman & Simmons. Attorney Simmons and the law firm of Berman & Simmons are experienced in handling third-party recoveries in personal injury matters.

4. Pursuant to the terms of the Contingent Fee Agreement, Berman & Simmons' "[c]ompensation shall only be paid upon recovery by settlement, verdict or otherwise" and that upon that contingency, Berman & Simmons would be paid "[r]easonable compensation ... by the client ..., but such compensation including that of any associated counsel to be paid by the client shall not exceed one-third (33–1/3%) of the gross amount collected." Fourth Brewster Aff. Ex. 3.

I/We am/are aware of the right of recovery provision contained in the Plan. I/We express my/our agreement to be bound by the provision. I/We understand, however, that my/our failure to express such agreement shall in no way affect the rights of the Company under the provision. I/We further agree that I/We shall not do anything to prejudice the rights of the Company in this matter.

Fourth Brewster Aff. Ex. 34, BS 117.

On October 3, 2001, Mrs. Green completed another information form relating to her accident in which she again provided to the Plan the name and address of her attorney, as well as the name and address of the insurance company for the owner of the vehicle that hit her. Mrs. Green again signed the form acknowledging the Plan's right of recovery. *Id.* at BS 118.

In an effort to establish the seriousness of Mrs. Green's injuries and to facilitate settlement of the Greens' claims, Attorney Simmons sent a list of medical charges totaling $68,850.29 from Central Maine Medical Center to the insurance company representing the owner and driver of the vehicle that hit Mrs. Green.[5] Brewster Aff. IV, Exs. 13, 14. In early January 2002, Attorney Simmons reached a settlement of the Green's claims with the insurance carriers of the owner and operator of the vehicle that struck Mrs. Green. Transcript of Deposition of Ellen Green at 25–26; Exs. 7 and 8 to Green Deposition; Green Affidavit ¶ 2. Each agreed to pay the policy limit of $100,000 to settle Ellen Green's claims. Days after negotiating

that settlement, Attorney Simmons also reached agreement with the Greens' own uninsured/underinsured motorist ("UM") carrier for them to receive the policy limit of $100,000. Simmons Deposition Transcript 17–18, 26–27; First Simmons Affidavit ¶¶ 3–4. In the settlement of the Green's claims, Berman & Simmons received three settlement checks each in the amount of $100,000 for a total of $300,000.00.[6] Brewster Aff. ¶ 5 and Ex. 1; Green Dep. 26–27, 28.

On January 21, Ellen Green met with Attorney Simmons in his Lewiston office for the purpose of signing the release and the settlement checks. Green Decl. (attached to Docket Item No. 163) ¶ 2. Both Attorney Simmons and Berman & Simmons recognized the medical benefits that had been provided by the Plan. Fourth Brewster Aff., Exs. 11, 20. At that January 21, 2002 meeting, Attorney Simmons told Ellen Green: "You may be contacted by the health insurance company in the future. We will deal with it when the time comes. Until then, let's let sleeping dogs lie." Green Decl. ¶ 3. The checks representing the settlement payments were deposited by Berman & Simmons into its Client Trust Account. Affidavit of Rachel Therrien at ¶ 3. On January 31, 2002, Berman & Simmons distributed to itself from the Client Trust Account $100,060.95, which represented its $100,000 fee and $60.95 in costs relating to the Greens' case. *Id.* ¶ 4.

Prior to reaching settlement, Attorney Simmons had requested the Greens send

---

**5.** These medical bills (in the amount of $68,850.29) reflected that Green's "commercial insurance" paid $67,683.71 of that medical bill. Fourth Brewster Aff. Ex. 15, at BS 222–224.

**6.** The settlement of Ellen Green's claims for $300,000 was proportioned from three differ-

ent insurance policies: the driver, the car owner, and the UM policy. *Defendant Green recovered for both her medical bills and other damages, but there was no breakdown between these amounts.* Fourth Brewster Aff. ¶ 7 and Ex. 3; Green Dep. at 26–27, 28.

him any unpaid accident-related medical bills. The Greens sent him copies of the unpaid medical bills they received. In its medical records file for Ellen Green, Berman & Simmons had an Explanation of Benefits ("EOB") dated October 22, 2001, from United Healthcare Insurance Company, the Plans' health insurer. Fourth Brewster Aff. Ex. 11. This EOB informed Berman & Simmons that Ellen Green was covered by a group health plan, the group health plan's name was "Hannaford Bros.," and that "[i]f there is medical coverage under the patient's automobile insurance, these charges should first be submitted to the automobile carrier for primary payment since this group health plan is secondary to automobile coverage." *Id.* As of early January 2002, Berman & Simmons prepared a list of outstanding balances that Ellen Green owed various health providers, which totaled approximately $27,000. *Id.* Ex. 20. Thereafter, Berman & Simmons took steps to settle Mrs. Green's outstanding unpaid medical bills out of the settlement proceeds.

On February 1, 2002, Attorney Simmons distributed $171,919.35 of the settlement proceeds to the Greens. *Id.* Ex. 25; Green Dep. at 27–29. In that February 1 letter, Attorney Simmons advised Ellen Green that "[w]e have not contacted your health care provider who may be claiming reimbursement rights." Fourth Brewster Aff. Ex. 25. Attorney Simmons also stated: "Please note any medical bills or expenses not identified above as being paid out of the settlement will be your responsibility." *Id.* On March 4, 2002, Attorney Simmons wrote to Ellen Green and stated:

> Stephens Memorial Hospital indicated they are attempting to collect from your health care insurance and thus would

not negotiate a discount. Under the circumstances we are enclosing $4,257.00. At some point, you can expect Stephens or your health care company to contact you. We will be happy to advise and represent you without further charge.

Fourth Brewster Aff. Ex. 28. On March 6, 2002, after paying or settling most of Mrs. Green's outstanding medical bills, Berman & Simmons sent the Greens a final check.[7] *Id.* Ex. 30. From Ellen Green's settlement proceeds, Berman & Simmons made distributions to Mrs. Green totaling $187,627.10. No one—not Mrs. Green, Attorney Simmons or anyone else at Berman & Simmons—ever contacted, or made any payment to, the Health Plan.

By letter dated May 24, 2002, the Plan sent Mrs. Green a copy of the right of recovery provision and a Recovery of Plan Assets Notice, requesting that she complete and return the Notice within one month. Second Mank Aff. Ex. 4. On June 5, 2002, Mrs. Green called and spoke by telephone with a Plan representative. She confirmed that she had received the Notice and advised that her legal claims had been settled in January 2002. Mrs. Green refused to disclose the terms of the settlement but stated that Attorney Simmons continued to represent her.

On June 13, 2002, the Plan's counsel wrote a letter Attorney Simmons and stated that the Plan paid Ms. Green's medical expenses in the amount of $141,335.75 arising from the January 18, 2001 accident, that the Plan has a lien on such settlement, and enclosed the reimbursement section of the Plan. Fourth Brewster Aff. Ex. 32. On June 19, 2002, Attorney Simmons responded to the June 13 letter and stated, "We represented Ms. Green with

---

7. In that letter, Attorney Simmons advised Mrs. Green that "X–Ray Professional called us to indicate that they will not negotiate any

monies while they are still attempting to collect from United Health Care." Fourth Brewster Aff. Ex. 30.

regard to her unfortunate catastrophic accident. The case was settled and the monies distributed a long time ago." *Id.* Ex. 33. Attorney Simmons also noted: "For your information, there was very little coverage from the tortfeasor considering the nature and extent of Mrs. Green's injury.... [w]e were never contacted by Hannaford Bros. and Hannaford Health Plan." *Id.*

On June 24, 2002, the Plan's counsel responded to Attorney Simmons' June 19, 2002, letter and stated:

> I have enclosed Mrs. Green's acknowledgment of the Health Plan's right of recovery of its medical payments and her agreement that she "shall not do anything to prejudice the rights of the Company in this matter." ... Please inform me of the amount of the settlement, the disbursement of the settlement funds and when the Health Plan will be reimbursed for its payments made on behalf of Mrs. Green.

*Id.* Ex. 34. When Attorney Simmons did not respond to the Plan counsel's letter of June 24, 2002, Plan counsel sent another letter dated July 3, 2002, and again stated:

> As you stated in your letter dated June 19, there was a settlement in this case. Again, please advise me of the settlement amount, how and to whom the settlement proceeds were issued, and when the Health Plan will be reimbursed for the medical expenses it paid on behalf of Mrs. Green.

*Id.* Ex. 35. Attorney Simmons did not respond to either the June 24 or July 3 letters. Plan counsel sent another similar letter dated August 13, 2002. Brewster Aff. IV, Ex. 36. Finally, on August 28, 2002, Attorney Simmons responded stating that "I do not feel that it would be appropriate for me to supply you with any information beyond that which I gave you in my letter of June 19, 2002." *Id.* Ex. 37.

## II. Summary Judgment Standard

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if, based on the record evidence, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). " 'Material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir. 1995) (citations omitted). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden has been met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.,* 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish ... the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); *Magarian v. Hawkins,* 321 F.3d 235, 240 (1st Cir. 2003) (" 'Conclusory allegations, improbable inferences, and unsupported speculation' are insufficient to defeat summary judgment.") (quoting *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir. 1993)).

## II. DISCUSSION

Count III of the Amended Complaint, which is brought pursuant to 29 U.S.C. § 1132(a)(3), seeks to enforce the Plan's reimbursement clause against Attorney Simmons and the law firm of Berman & Simmons. Section 1132(a)(3) states that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3). In a prior opinion the Court addressed the parties' arguments with regard to summary judgment on Count III and ruled that the Plan could not make out a claim for equitable restitution pursuant to the Supreme Court's holding in *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), because no identifiable proceeds from the settlement funds remained in the possession of Attorney Simmons or Berman & Simmons. Memorandum of Decision and Order (Docket Item No. 127). At that time, however, the Court left open the issues of: (1) whether the Plan was entitled to pursue its claim for "other appropriate equitable relief" under section 1132(a)(3) aside from equitable restitution, against Attorney Simmons and Berman & Simmons; and if so (2) whether there was a factual basis upon which to grant such relief. The Court will now consider these issues.

### A. Availability of a Cause of Action Against Attorneys Under Section 1132(a)(3)

Defendants now move for summary judgment on the remaining part of Count III, arguing that 29 U.S.C. § 1132(a)(3) permits suits against participants' attorneys only if the attorney has a professional or contractual relationship with the plan and asserting that no such relationship exists in this case. For support, Defendants rely on cases in which courts have concluded that a plan beneficiary's attorney who receives settlement funds (or other funds in recovery) from a third-party does not have any duty enforceable under section 502(a)(3) of ERISA to honor the ERISA plan's subrogation or reimbursement rights with respect to the settlement proceeds if the attorney has no professional or contractual relationship with the plan. *See, e.g., Hotel Employees & Restaurant Employees Int'l Union Welfare Fund v. Gentner,* 50 F.3d 719 (9th Cir.1995); *Chapman v. Klemick,* 3 F.3d 1508, 1510–11 (11th Cir.1993); *Mid Atl. Med. Servs., Inc. v. Do,* 294 F.Supp.2d 695 (D.Md.2003); *Great–West Life & Annuity Ins. Co. v. Bullock,* 202 F.Supp.2d 461, 465 (E.D.N.C. 2002); *Maryland Elec. Indus. Health Fund v. Levitt,* 155 F.Supp.2d 482, 484 (D.Md.2001). Plaintiff responds arguing that no separate relationship between the Plan and the Attorneys need be established on the facts of this case because the Attorneys possessed and controlled the $300,000 settlement monies and the Plan's equitable right to the settlement funds arose when the Plan paid benefits on behalf of Mrs. Green for her injuries. Plaintiff relies on cases from other circuits that are asserted to support the proposition that a Plan may pursue funds in the hands of a plan beneficiary's attorney to the extent the attorney holds those funds on behalf of the beneficiary who is subject to the terms of the Plan *See Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough,* 354 F.3d 348, 353–54 (5th Cir.2003)(section 1132(a)(3) authorizes a cause of action against an attorney who holds disputed settlement funds on behalf of a participant

in an ERISA plan); *IBEW–NECA Southwestern Health & Benefit Fund v. Douthitt*, 211 F.Supp.2d 812, 816 (N.D.Tex.2002)(finding that the settlement funds at issue, which were being held in the attorney's trust account for the plan beneficiary, were within the plan beneficiary's possession and control); *see also Great–West Life & Annuity Ins. Co. v. Smith*, 180 F.Supp.2d 1311, 1313 (M.D.Fla. 2002). These cases, Defendants respond, are distinguishable because in this case the Plan is seeking to disgorge legal fees directly from the Green's attorneys, which were paid to the attorneys before the Plan took any steps to make them aware of any actual or potential reimbursement claim.

 Unlike other ERISA provisions, section 1132 is silent as to who may be sued for violating the terms of a plan. In this case, clearly there was no professional or contractual relationship between Attorney Simmons or Berman & Simmons and the Plan. The Supreme Court has recognized, however, that a cause of action pursuant to section 1132(a)(3) can be stated against a non-fiduciary. *See Harris Trust and Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000). The existence of the Plan's right under ERISA to sue an attorney with no professional or contractual relationship to the plan and where no identifiable proceeds of a settlement remain for equitable relief is specifically fact-based and, thus, difficult to predict what the Court of Appeals for the First Circuit might ultimately hold on this issue. Nevertheless, for purposes of this opinion, the Court will assume, without deciding, that the Court of Appeals for the First Circuit would permit a section 1132(a)(3) cause of action against a plan participant's attorney and law firm even in the absence of a professional or contractual relationship with the plan.

## B. Availability of "Other Appropriate Equitable Relief"

Plaintiff argues that she should prevail on Count III because the "other appropriate equitable relief" sought under section 1132(a)(3) contemplates other equitable remedies, such as an accounting for profits, even though equitable restitution is not available because there are no identifiable proceeds from the settlement in the possession of Attorney Simmons or Berman & Simmons. Relying on *Greenwood Mills, Inc. v. Burris*, 130 F.Supp.2d 949 (M.D.Tenn.2001), Plaintiff contends, the Court should order an accounting for profits because Defendants had a duty to address the Plan's claim for reimbursement before distributing the settlement proceeds and Defendants represented Green in a manner that enabled Green to avoid her obligation to the Plan. *See also Bullock*, 202 F.Supp.2d at 465.

In *Greenwood Mills*, the evidence indicated that the plan beneficiary's attorney (who died prior to the filing of the action) had prior knowledge of the ERISA plan's subrogation provision and advised the plan beneficiary to misrepresent the amount of the settlement, instructed the plan beneficiary not to repay the plan, and received and distributed the settlement funds without regard to the plan's subrogation provision. *Id.* at 961. The *Greenwood Mills* court stated that:

[a] lawyer who is fully aware of his client's obligation under an ERISA plan to honor the subrogation interest of his employer may be held liable under § 1132(a)(3) . . . . . Congress' stated goal of ensuring the security of participants' interests in ERISA plans, an interest that necessarily includes the solvency of the plan, will be advanced by erecting a barrier to beneficiaries' lawyers' interference with the plan's (or its related

entity's) rightful recoupment of paid benefits under subrogation provisions. Holding lawyers liable for diverting monies due plans into the pockets of their clients or themselves is to uphold the established policy, exemplified in ERISA's remedial scheme, of equity to all involved with plans—a principle thwarted if lawyers were allowed to enrich themselves unjustly in direct contradiction of the plan's terms. *Id.* at 960–61. Ultimately, the court held that the attorney's estate was liable under section 1132(a)(3) for violating the terms of an ERISA plan because the attorney knew of the plan's subrogation provision and instructed the plan beneficiary to lie to avoid complying with the plan's subrogation provision. *Id.* In *Greenwood Mills,* the remedy, within the parameters of "appropriate equitable relief," was disgorgement of the profits gained by the attorney's wrongful conduct in advising his client to violate the terms of the ERISA plan *Id.* at 963.

To support the argument that the attorneys engage in conduct that was intended to deceive the Plan and assist Mrs. Green in avoiding her obligation to reimburse the Plan, Plaintiff relies on specific conduct of Attorney Simmons. First, Plaintiff points out that on December 21, 2001, Attorney Simmons wrote to the Greens informing them of the $300,000 settlement and stated: "As you know, there are medical liens and we are taking steps to deal with them." Second, Plaintiff points out that on January 21, 2002, Attorney Simmons met with the Greens in his Lewiston office for the purpose of signing a release and the three settlement checks. During the course of that meeting, Attorney Simmons told Ellen Green: "You may be contacted by the health insurance company in the future. We will deal with it when the time comes. Until then, let's let sleeping dogs lie." Green Decl. ¶ 3. Finally, Plaintiff points out that on February 1, 2002, Attorney Simmons wrote to Mrs. Green providing the amount of the settlement and an accounting for those monies. At the bottom of the letter, Attorney Simmons wrote, "Please note that any medical bills or expenses not identified above as being paid out of the settlement will be your responsibility. We have not contacted your health care provider who may be claiming reimbursement rights." Fourth Brewster Aff. Ex. 25. Plaintiff also relies on generalized statements made by the law firm or Attorney Simmons regarding the fact that many health insurance policies include a clause providing for recoupment of benefits as well as the many years of experience as actively practicing attorneys in the area of personal injury law.

 The *Greenwood Mills* case is instructive, but it is not dispositive of this case. Unlike *Greenwood Mills,* there is here no wrongful or bad faith conduct on the part of Attorney Simmons or Berman & Simmons. Contrary to Plaintiff's argument, the evidence shows that neither Attorney Simmons nor the law firm of Berman & Simmons were on notice of any claim against their client or them under the Plan's right of recovery provision at any time when the attorneys were in possession of the claimed funds. As experienced personal injury attorneys, Defendants may have possessed a general knowledge that the Health Plan might have had a right of recovery provision and the awareness that the Health Plan might seek to enforce that provision.[8] However,

---

8. Plaintiff contends that even before representing the Greens, Attorney Simmons and the law firm were aware of the Plan's right of recovery provision. With respect to Attorney Simmons, there is no evidence of this prior awareness of the Plan's right of recovery pro-

that is an insufficient basis upon which to require an accounting for profits from a plan beneficiary's attorney who has no professional or contractual obligation to the plan Moreover, although the record clearly indicates that Attorney Simmons and the law firm knew that the Plan was paying many of Mrs. Green's medical bills, that does not establish that either Attorney Simmons or Berman & Simmons were aware of any specific interest of the Plan in pursuing reimbursement from the settlement proceeds.

■ There is no evidence that Attorney Simmons or anyone at the law firm was aware that Mrs. Green had signed forms that the Plan had sent her acknowledging the Plan's right to reimbursement. Mrs. Green did not send copies of those documents to Attorney Simmons, nor did she ever speak with Attorney Simmons or anyone else at Berman & Simmons about these documents. Green Dep. at 71–73. Here, the Plan itself was well aware that Mrs. Green had engaged an attorney to pursue a claim on her behalf because she had twice specifically identified that attorney to the Plan and the Plan took no timely steps to assert or protect its interest. In these circumstances, the attorneys were not required to generate an otherwise nonexistent conflict with their client's interest by initiating contact with the Plan before distributing settlement proceeds.

■ The burden to timely assert its rights of reimbursement properly rests, in the first instance, on the Plan. In this case, the Plan had all the information it needed to pursue its claim for reimbursement in a timely manner. Prior to the payment of the settlement funds by the insurers in January 2002 and their ultimate distribution, the Plan never contacted Attorney Simmons, even though it was aware as early as July 31, 2001, that he was representing Mrs. Green. First Simmons Affidavit ¶ 6. It was not until June of 2002, some four months after the final disbursement of the settlement took place, that Attorney Simmons received a letter from the Plan, which informed Attorney Simmons for the first time that the Plan was prepared to assert a claim to recover the medical benefits it paid on Mrs. Green's behalf.

With respect to the outstanding unpaid medical bills, Plaintiff points out that Attorney Simmons and his law firm negotiated and ultimately paid Mrs. Green's unpaid medical bills, but they never contacted the Plan to notify it of the settlement even though they were aware that the Plan had paid many of Mrs. Green's medical expenses. There is no evidence that either Attorney Simmons or Berman & Simmons acted in bad faith with respect to the disbursement of the settlement proceeds. Indeed, after Attorney Simmons received the payments from the three insurers to settle the case, he continued to negotiate the payment of some outstanding medical bills and did not ultimately make a final payment to Mrs. Green until all of the outstanding medical bills he was aware of were resolved, approximately two months after initially receiving the settlement monies.

vision. With respect to another Berman & Simmons attorney, although it appears that in a personal injury action involving another Plan participant the Plan alerted that attorney that it had a reimbursement claim that it intended to pursue, this is an insufficient basis upon which the Court can infer knowledge of the Plan's intent to pursue reimbursement in this case. Ironically, it is this type of notice that the Plan gave another Berman & Simmons attorney in another case that the Plan failed to provide to Attorney Simmons in this case.

While it might have been to Attorney Simmons and Berman & Simmons greater credit had their conduct reflected a more refined, general sense of professional probity, they had no obligation to the Plan, under the circumstances of this case, to protect the Plan's later asserted interest in the settlement or to serve the Plan's claim for reimbursement. Under these circumstances, the Court concludes that ERISA does not impose any affirmative duty on attorneys representing plan beneficiaries to act to serve the Plan's interest in opposition to the conflicting interest of the attorney's own client. The absence of any bad faith conduct that was violative of any duty owed to the Plan absolves Attorney Simmons and Berman & Simmons of any equitably derived affirmative duty to contact the Health Plan. In the absence of such a duty, the attorneys here were free to choose distribution options that appeared to favor their client.

Accordingly, it is **ORDERED** that Defendants' Renewed Motion for Summary Judgment on the remaining claims in Count III be, and it is hereby, **GRANTED**. All claims herein having been resolved, it is **ORDERED** that judgment herein be **ENTERED**.